IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA WEBB | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 cv 2276 |
| v. | ) | |
| | ) | Magistrate Judge Arlander Keys |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

**I. PROCEDURAL HISTORY**

Ms. Webb applied for Supplemental Security Benefits on March 24, 2006. Administrative Record at 221. In her application, she alleged that she became disabled on March 13, 1993. *Id.* On June 20, 2006, the Social Security Administration initially denied Ms. Webb's application. *Id.* at 15. Ms. Webb's application was again denied upon reconsideration on December 10, 2007. *Id.* On March 7, 2008, Ms. Webb made a written request for a hearing. *Id.*

Administrative Law Judge ("ALJ") Michael G. Logan held the hearing and rendered the opinion. *Id.* at 36. The hearing was held over two days. The first day of the hearing was January 23, 2009. *Id.* at 75. The hearing was continued until additional medical records could be obtained. *Id.* at 123. The hearing reconvened on July 28, 2009. *Id.* at 36. The ALJ issued his opinion on January 25, 2010. *Id.* at 29.

On February 16, 2010, Ms. Webb requested that the Appeals Council review the ALJ's decision. *Id.* at 8. On February 15, 2011, the Appeals Council denied Ms. Webb's request for review and is thus the final decision of the administrative agency. *Id.* at 5. On April 4, 2011, Ms. Webb appealed the decision to the District Court. The parties consented to vest jurisdiction in a Magistrate Judge, and it was assigned to this Court on May 11, 2011. The case is currently before the Court on cross motions for summary judgment.

**II. FACTUAL BACKGROUND**

When Ms. Webb applied for social security benefits, she was 32 years old. R. at 221. Ms. Webb was born on February 22, 1974, and has four children. *Id.* at 241, 258. As of the first day of the hearing, Ms. Webb's children were aged 19, 17, 15, and 11. *Id.* at 105. Her alleged disabilities are severe depression, morbid obesity, HIV, hypertension, and back pain. *Id.* at 310. According to Ms. Webb's brief, the main symptom of her HIV is her depression. *Id.*

    **A. Medical Evidence**

        **1. Psychiatric Medical Records**

Ms. Webb has a diagnosis of depression. On her application for disability, she stated that she sometimes has problems concentrating or thinking. *Id.* at 259. She denied hearing voices. *Id.* Furthermore, Ms. Webb has had some trouble sleeping

due to her pain, but is not diagnosed with insomnia.  *Id.* at 51, 260.

In 1991, Ms. Webb reportedly attempted suicide by overdose and was hospitalized at St. Bernard Hospital.  *Id.* at 533.  The notes from that hospitalization are not in the record.

In 2008, Ms. Webb went to Englewood Mental Health Center for psychotherapy.  *Id.* at  493. Mr. John Carlsen was the attending therapist.  *Id.* The record only contains notes from three therapy sessions, including the intake, between the dates of September 26, 2008 and October 17, 2008.  The notes indicate that Ms. Webb complained of insomnia and that the medication she was on was ineffective.  *Id.*  She also stated that her depression causes her to lack the desire to get up and do anything.  *Id.* at 497. There were some other stressors in Ms. Webb's life such as her son being incarcerated for selling drugs and the death of two of her brothers.  *Id.* at 493.   Throughout her treatment at Englewood, her Global Assessment of Functioning ("GAF") was a 50. *Id.* at 495, 507.  The GAF is a subjective scale that measures a person's social, occupational, and psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994).  The scale ranges from zero to one hundred, and a lower score indicates more difficulty with social, occupational, or psychological functioning. *Id.*   A GAF of 50 indicates either: "serious symptoms" or "any serious impairment in social, occupational, or school functioning."  *Id.*

Dr. Ruth Rosenthal was Ms. Webb's attending psychiatrist at Mount Sinai. *Id.* at 540. Ms. Webb started seeing Dr. Rosenthal on January 27, 2009. *Id.* at 541. After the initial intake, Dr. Rosenthal saw Ms. Webb once a month from March of 2009 through June of 2009. *Id.* at 542, 544, 546, and 548. The notes indicate that Ms. Webb did not have a formal thought disorder, delusions, or suicidal ideation. *Id.* at 534. At every appointment with Dr. Rosenthal, Ms. Webb's hygiene and grooming was noted to be good. *Id* at 542, 544, 546. However, Ms. Webb's mood was noted to be dysphoric, and her affect was constricted. *Id.* at 534. On May 18, 2009, Ms. Webb stated that "she is sleeping better." *Id.* at 546. However, Ms. Webb's "mood was still down". *Id.* In May 2009, Dr. Rosenthal notified Ms. Webb that she was leaving Mount Sinai in June and that Ms. Webb would be transferred to Dr. Warikoo. *Id.* at 547.

On July 17, 2009, Dr. Warikoo saw Ms. Webb for medication management. *Id.* at 550. The notes from that contact indicate that Ms. Webb's mood was slightly improving and that she was sleeping better. *Id.* The mental status exam concluded that Ms. Webb's thoughts were coherent and there was no evidence of a formal thought disorder. *Id.* Additionally, Ms. Webb did not have any abnormal perceptions. *Id.* At the appointment, Ms. Webb was able to ask appropriate questions and understand directions regarding her medication. *Id.* at 551.

On July 17, 2009, Dr. Warikoo filled out a mental impairment questionnaire. R. at 529. According to Ms. Webb's attorney's statements during the hearing, she saw Dr. Warikoo two or three times in 2008. *Id.* at 42. On July 17, 2009, Dr. Warikoo found that Ms. Webb's GAF score was a 55 and that she had, amongst other symptoms, difficulty thinking or concentrating, poor memory, and decreased energy. *Id.* at 529. According to Dr. Warikoo, Ms. Webb has extreme difficulty maintaining social functioning. *Id.* at 532.

Dr. Warikoo also found that, on average, Ms. Webb's impairments would cause her to be absent from work more than three times per month. *Id.* at 530. Regarding Ms. Webb's mental abilities required for unskilled labor, Dr. Warikoo found that Ms. Webb would be unable to remember work-like procedures; maintain attention and concentration; and perform work at a normal pace. *Id.* at 531. In addition, Ms. Webb's ability to carry out very short and simple instructions was seriously limited. *Id.*

Again, on August 14, 2009, Dr. Warikoo found that Ms. Webb's thoughts were coherent. *Id.* at 553. The notes state that Ms. Webb was beginning to feel better. *Id.* at 553. Ms. Webb was able to ask appropriate questions and appeared to understand directions. *Id.* at 554. Ms. Webb's GAF score was a 55. *Id.* at 554.

## 2. Medical Evidence Related to Ms. Webb's Back

On Ms. Webb's application, she stated that she sometimes needs assistance with standing and that she sometimes holds on to furniture or a counter and she uses a walker. *Id.* at 264. Ms. Webb reported that she can get out of a chair, but she cannot climb stairs very well. *Id.* However, when asked in the application how many stairs she could climb, Ms. Webb reported that she could climb "4 or 5 maybe." *Id.*

On May 23, 2006, Dr. Romi Sethi examined Ms. Webb for the Bureau of Disability Determination Services ("DDS"). *Id.* at 340. Dr. Sethi's notes indicate that Ms. Webb does not use an assisting device. *Id.* Further, Dr. Sethi found that Ms. Webb had full range of motion in all of her joints and had no difficulty getting on and off the examination table. *Id.* at 342.

In 2006, therapy had been prescribed for Ms. Webb's back pain. Upon intake, Ms. Webb complained that she is unable to sit longer than 30 minutes and described her pain as a "punching pain." *Id.* at 315. At the time, Ms. Webb stated that she was taking Aleve and using a heating pad to help relieve her pain. *Id.*

According to the last treatment notes from 2006, Ms. Webb rated her pain as 6 out of 10. *Id.* at 471. The records also indicate that Ms. Webb was not compliant with her exercise routine and failed to attend any of her aquatherapy appointments. *Id.* The discharge notes state that Ms. Webb reported that she did not feel well enough to continue with her therapy. *Id.* at

479.

In 2008, Ms. Webb again attempted physical therapy. *Id.* at 485. The discharge notes indicate that she attended seven sessions and was then discharged, because she missed three appointments and never called to set up a new appointment. *Id.* However, prior to discharge, Ms. Webb did have some progress with reducing her pain and strengthening her core. *Id.* Ms. Webb noted that her pain was constant and aggravated by standing more than 30 minutes. *Id.* at 488.

On July 16, 2009, after the first hearing, Ms. Webb had an MRI at Saint Anthony Hospital. *Id.* at 528. The MRI revealed that Ms. Webb had "mild degenerative changes at L4-L5" and a "probable hemangiona." *Id.*

### 3. Other Impairments

On December 26, 2005, Ms. Webb went to the ER for flu like symptoms. *Id.* at 324. Despite taking Procardia, potassium chloride, and a water pill, Ms. Webb's blood pressure was 148/105. *Id.*

Ms. Webb had her ears drained during a procedure at Mount Sinai on July 30, 2008. *Id.* at 417. Ms. Webb does have some hearing loss, but the Audiology Evaluation Report shows that Ms. Webb has 100% word recognition bilaterally at 70db. *Id.* at 409.

Throughout Ms. Webb's treatment at Mount Sinai, her HIV was diagnosed to be asymptomatic. *Id.* at 459, 462, 465. The notes

from February 28, 2008 indicated that Ms. Webb did not want to know her CD4 levels. *Id.* According to the notes, her CD4 level was a 383.[1] *Id.* at 461.

On September 14, 2008, Ms. Webb had a routine follow up for HIV. She complained of feeling tired all the time and having some insomnia. *Id.* at 458. The notes state that Ms. Webb did not have any muscle weakness or joint pain. *Id.*

On October 16, 2008, Ms. Webb went to Dr. Glick at Mount Sinai for a follow up after some blood tests. *Id.* at 455-457. The notes from that visit state that she complained of having insomnia. *Id.* at 456. Ms. Webb's HIV was stable at this time. *Id.*

### 4. Medical Evaluations for Disability Benefits

On September 24, 2007, Dr. Radomska conducted a psychiatric evaluation for the Bureau of Disability Determination Services. *Id.* at 366. At the time of the evaluation, Ms. Webb was oriented to person, place, and time. *Id.* The notes indicate that Ms. Webb's "attitude and degree of cooperation was fine." *Id.* Dr. Radomska noted that Ms. Webb was walking with a cane. *Id.* However, Ms. Webb's posture and gait was "not abnormal." *Id.*

---

[1] According to the U.S. Department of Health and Human Services, a CD4 count between 500-1000 is considered normal. A CD4 count below 350 is when a person should start considering treatment. A CD4 count below 200 is one criterion for AIDS. U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *CD4 Count*, http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last updated Oct. 11, 2010).

Regarding Ms. Webb's psychiatric history, Ms. Webb reported
that she was admitted to St. Bernard's Hospital in 2002 after a
suicide attempt. *Id.* at 367. Additionally, Ms. Webb stated that
she had been seeing a psychiatrist for the 5 years since her
hospitalization. *Id.* At the time of the exam, Ms. Webb
complained of feeling depressed and unable to concentrate. *Id.*
Furthermore, Ms. Webb reported having difficulties with
attention, memory, and daydreaming. *Id.*

Dr. Radomska conducted an exam of Ms. Webb's mental
capacity. Dr. Radomska determined that at the time of the exam,
Ms. Webb's GAF was 45. *Id.* at 369. Ms. Webb was unable to: tell
how many weeks were in a year, multiply two numbers, or determine
how many nickels are in $1.15. *Id.* at 368. Additionally, Dr.
Radomska found that Ms. Webb would not be capable of handling her
own funds if benefits were granted to her. *Id.* at 369. At the
time of the exam, Ms. Webb's thought process was linear and goal
directed. *Id.* at 368. Dr. Radomska noted that Ms. Webb's
concentration was poor. *Id.* at 369.

On October 10, 2007, Dr. John Tomassetti, Ph.D. wrote a
residual functional capacity ("RFC") for Ms. Webb's mental
status. Dr. Tomassetti found that Ms. Webb does have some
problems with her concentration and memory. *Id.* at 385.
However, Ms. Webb's thought process was normal and her memory was
intact. *Id.* Dr. Tomassetti found that Ms. Webb was moderately
limited in her ability to: accept instructions and appropriately

respond to criticism; maintain attention and concentration for extended periods; complete a normal workday or workweek without interruptions from psychologically based symptoms; and to understand, carry-out, and remember detailed instructions. *Id.* at 383-384.

On November 17, 2007, Dr. Villanueva performed a consultative examination of Ms. Webb. Ms. Webb had some slight tenderness on her lower back and her range of motion was 35 degrees. At the time of the exam, Ms. Webb was taking physical therapy. *Id.* at 373.

Dr. Villanueva noted that Ms. Webb uses a cane and that she can walk ten feet without a cane. *Id.* at 372. While walking ten feet without the cane, Ms. Webb walked slowly and needed to hold onto the walls. *Id.* However, Ms. Webb, with difficulty, was able to get on and off the examination table. *Id.*

On November 27, 2007, Dr. Rose examined Ms. Webb. *Id.* at 382. He found that Ms. Webb's "vertebral elements and disc spaces are well aligned and without significant abnormality." *Id.* Dr. Rose's impressions were that Ms. Webb had a "normal lumbar spine examination." *Id.*

Dr. Charles Kenney completed a physical RFC form on December 6, 2007. *Id.* at 394. Dr. Kenney's RFC reflects that Ms. Webb can occasionally lift twenty pounds and can frequently lift ten pounds. *Id.* at 388. Additionally, Dr. Kenney put an environmental limitation that Ms. Webb should avoid even moderate

exposure to fumes, odors, dust, gases, and poor ventilation. *Id.* at 391.

During Dr. Kenney's examination, Ms. Webb was able to get on and off the exam table with no difficulty. *Id.* at 394. Dr. Kenney stated that, even though Ms. Webb was using a cane, the medical information did not support her need of the cane. *Id.* Ms. Webb had normal gait and posture. *Id.*

Regarding Ms. Webb's depression, Dr. Kenney listed Ms. Webb's symptoms as sleep disturbances and difficulty concentrating or thinking. *Id.* at 398. She was taking Zoloft and Paroxetine. *Id.* at 407. Ms. Webb had moderate difficulties in maintaining social functioning. *Id.* at 405. At the time, Ms. Webb was not responding appropriately to her anti-depressants. *Id.* at 407.

On October 2, 2008, Dr. Hernando Torres, Ms. Webb's treating physician, wrote an arthritis RFC. *Id.* at 410. Dr. Torres is a neurosurgeon and had two contacts with Ms. Webb prior to writing his RFC. *Id.* at 100-101, 410. According to Dr. Torres' RFC, Ms. Webb can walk one city block before being in severe pain or requiring rest and must occasionally use a cane. *Id.* at 411-412. The RFC also indicates that Ms. Webb could sit, stand, and walk less than two hours in an eight hour work-day. *Id.* at 411. However, Ms. Webb's impairments were noted to have good days and bad days. *Id.* at 412. Dr. Torres estimated that Ms. Webb would be absent from work more than four days per month due to her

impairments.  *Id.*

**B. Hearing Testimony**

**1. Ms. Webb's Testimony**

Ms. Webb testified that she was expelled from school for fighting in the eighth grade.  *Id.* at 83.  Ms. Webb never returned to school. Despite the numerous fights she got into, Ms. Webb was never diagnosed with a behavior disorder, nor was she in a class for people with behavior disorders.  *Id.*  Ms. Webb did not receive any special education services.  *Id.* at 85.  She testified that she has taken a few classes towards a GED, but was unable to finish them. *Id.* at 52.

In response to questioning, Ms. Webb testified that her back and hip prevent her from working. *Id.* at 96. On the first day of the hearing, Ms. Webb testified that, at that moment, her pain was a ten out of ten.  *Id.* at 97.

At the first hearing, Ms. Webb did not have a cane because she forgot to bring it.  *Id.* at 44.   During the second hearing, Ms. Webb was using a walker.  *Id.*  During the second hearing, Ms. Webb testified that she had been using the walker for about three months, because her impairments had gotten worse.  *Id.* Ms. Webb testified that she mostly uses the cane inside the house.  *Id.* at 111.  For example, she uses the cane to get "off the toilet" or when she needs to stand while the "bath is getting ready."  *Id.* She also testified that she uses the cane when she goes on doctor's visits.  *Id.*  She did not use a cane during her most

12

recent employment at a chocolate factory, because she was not allowed to bring a cane into work. *Id.* at 111.

Next, Ms. Webb testified to her obesity. Ms. Webb testified that she is 5'5" tall and weighed approximately 275 pounds during the first day of the hearing. *Id.* at 81. During the first day of the hearing, she testified that her highest weight was 300 pounds. *Id.* On the second day of the hearing, approximately six months later, Ms. Webb testified that she weighed 300 pounds. *Id.* at 44. Ms. Webb testified that, despite taking Lasik and Procardia, her blood pressure was "still running very high." *Id.* at 102, 104. On the second day of the hearing, Ms. Webb again testified that despite the medications she takes, her blood pressure is still high. *Id.* at 47.

Ms. Webb testified that, on an average day, she just lies in bed, because her back hurts when she gets up. *Id.* at 105. Ms. Webb testified that she does not do any chores around the house, because of her back pain. *Id.* at 49, 108. She does not do the shopping, and her older son and daughter do the cooking. *Id.* at 108. Further, Ms. Webb testified that her daughter assists her with grooming and bathing. *Id.* at 49-50, 108. Ms. Webb's two older children help the younger children get ready for school. *Id.* at 105.

Ms. Webb testified that her depression also prevents her from working. *Id.* at 97-98. When asked how her depression affects her, Ms. Webb testified that she "[does] not want to get

up" and she does not want to do anything.   *Id.* at 98.   In addition to being prescribed medication for her depression, Ms. Webb has been seeing a psychotherapist.   *Id.* at 102-103.   Ms. Webb testified that she was currently seeing a new therapist at Mount Sinai because she was having difficulties getting the records from Englewood Mental Health Clinic.   *Id.* at 103.   As of the first day of the hearing, Ms. Webb had seen the new therapist twice.   *Id.*

   Ms. Webb testified that she does not belong to any clubs, groups, or organizations.   *Id.* at 108.   Ms. Webb receives phone calls from people, but she does not like talking to anyone.   *Id.* For recreation, Ms. Webb testified that she watches television. *Id.* In addition, Ms. Webb reported only leaving the house about five times a month to visit her doctors.   *Id.* at 98.

   Regarding her treatment for her back pain, Ms. Webb testified that none of the medication Dr. Glick or Dr. Torres prescribed helped to alleviate any pain. *Id.* at 100.   Further, Ms. Webb testified that the physical therapy at Schwab Rehabilitation Center was not working for her.   *Id.*   For her pain, Ms. Webb takes 500 mg of Naproxen and Acetaminophen with codeine. *Id.* at 104.   It is not clear from the testimony or the record how often she takes medication for her pain.   Ms. Webb testified that she has no side effects from any of the medications.   *Id.*

14

At the second hearing, Ms. Webb was apparently holding her leg. *Id.* at 51. When questioned about it, Ms. Webb stated that she had a pain in her leg. *Id.* She added that "it's difficult to sit for a long period of time." *Id.*

Ms. Webb was asked by her attorney if she would be able to work at a simple job that involved sitting and standing. *Id.* Ms. Webb testified that it would be very difficult because when she stands up her back "feels like it's breaking" and if she sits "for a long period of time, it's like a knot." *Id.*

Regarding Ms. Webb's sleeping problems, she testified that the pain keeps her awake at night. *Id.* Ms. Webb testified that she "[stays] up for three or four days at a time ... without any sleep." *Id.* at 106. When she finally does sleep, Ms. Webb testified that she sleeps for "two or three" hours. *Id.* at 107. Additionally, Ms. Webb had tried several different sleeping pills, but none had worked. *Id.* However, at the time of the second hearing, Ms. Webb was taking a sleeping pill, which helped her a little bit. *Id.* at 48.

Next, Ms. Webb testified regarding her HIV. Ms. Webb was diagnosed with HIV in March of 1993 at the age of 18. *Id.* at 82. However, other than some sores on her body, Ms. Webb did not report having any direct physical symptoms of HIV. *Id.* at 112. Her most recent visit to a doctor for HIV was with Dr. Glick on July 9, 2011. *Id.* at 63. According to Ms. Webb, Dr. Glick recommended that she take medication for her HIV. However, Ms.

15

Webb testified that she refuses to take any medication for it because she is "scared [she will] pass sooner than [she is] supposed to." *Id.* at 63. Additionally, Ms. Webb does not know, nor does she want to know, anything about her CD4 levels. *Id.* at 63-64.

Ms. Webb next testified about her employment history. Ms. Webb's most recent employment was at a chocolate factory in 2006. *Id.* at 90. While at the chocolate factory, Ms. Webb worked a total of six shifts that each lasted twelve hours before she quit. *Id.* at 110. She testified that she was never absent from work those days, never had any problems with her coworkers, and never made any mistakes. *Id.* When asked why she quit working, Ms. Webb testified that she was unable to tolerate working, because of her back pain. *Id.* at 111.

Prior to her job at the chocolate factory, Ms. Webb worked for the Department of Rehabilitation as a home care attendant. *Id.* at 95. When she worked home care, it was "off and on" employment for a couple of years and she worked for a few different clients. *Id.* In 2004, Ms. Webb earned $4,000. *Id.* The Vocational Expert opined during Ms. Webb's testimony, that the exertion level of a home care attendant ranges depending on what tasks the attendant needs to do, but it is generally in the medium range. *Id.* However, if the attendant needs to lift the patient, then the work can be in the heavy range. *Id.* at 96.

16

Ms. Webb reported that she has also worked in childcare. *Id.* at 89.

When asked whether she has taken any job specific vocational training other than classes for a GED, Ms. Webb testified that she had not. *Id.* at 87. According to Ms. Webb, she was unable to get her GED because she "couldn't do the work" and "didn't feel like getting up half the time to go." *Id.*

Ms. Webb was questioned about her 2005 and 2006 tax return because the tax returns showed she had $6,000 in self-employment income in 2006 and $9,000 in 2005. *Id.* at 88-89. At the time of the hearing, the IRS was investigating the claimed self-employment income. *Id.* at 89. Ms. Webb denied having any self-employment income and attributed the error to a case of identity theft. *Id.* at 109. Ms. Webb testified that there is another Pamela Webb who is showing up on her credit report and she is trying to clear her name. *Id.* at 109-110. The ALJ noted that the issue of incorrectly reported self-employment income goes to "making false statements to the government", and it affects Ms. Webb's credibility. *Id.* at 40-41.

## 2. Testimony of Dr. Rosenfeld

Dr. Ellen Rosenfeld, Psy.D. testified at the first day of the hearing as a medical expert. *Id.* at 112. She first noted that there was no record of Ms. Webb's contacts with the psychotherapist from Mount Sinai. *Id.* at 112-113. Thus, her testimony did not include any of the information from the

17

counselor at Mount Sinai. *Id.* at 113. The ALJ noted that it was extremely important to get the treatment notes because the notes would "tell the longitudinal story" of Ms. Webb's illness, and would provide context for the conclusions noted in the RFC. *Id.* at 114.

Dr. Rosenfeld was unable to testify, because of the gaps in the record provided to her, whether Ms. Webb was limited to simple and routine tasks, and whether she would have moderate difficulty with regularly attending work. *Id.* at 115. Dr. Rosenfeld did note that Ms. Webb was unable to maintain her job at the chocolate factory because of her physical issues, not her mental health issues. *Id.*

Dr. Rosenfeld noted that there is no evidence that Ms. Webb was seeing a psychiatrist for five years. *Id.* at 113. Further, there was no evidence of weekly therapy at Mount Sinai, nor was there any evidence of how the anti-depressant's ineffectiveness has been treated. *Id.*

Regarding Ms. Webb's purported insomnia, Dr. Rosenfeld testified that there was no "longitudinal record of problematic sleeping patterns." *Id.*

### 3. Testimony of Dr. Slodki

Dr. Sheldon Slodki testified as a medical expert at the first hearing. Dr. Slodki noted that Dr. Torres diagnosed Ms. Webb with spondylosis without having an MRI for Ms. Webb's back. *Id.* at 118. Without an MRI, Dr. Slodki did not know how Dr.

Torres could have diagnosed spondylosis. *Id.* at 119. Ms. Webb interjected that she had not had an MRI because she was afraid to undergo an MRI and she would not fit in the machine. *Id.* at 118.

Dr. Slodki also pointed out that the three most recent blood pressure readings were: 129/80, 129/80, and 140/90. *Id.* at 119. Given the blood pressure readings, Dr. Slodki does not consider Ms. Webb's hypertension to be out of control. *Id.*

Regarding Ms. Webb's cane use, Dr. Slodki agreed with the statement that based on the records he reviewed and Ms. Webb's testimony, it would be reasonable that Ms. Webb would occasionally use a cane. *Id.* at 120. Dr. Slodki accepted Dr. Torres' RFC and testified that he "has great respect for [Dr. Torres] ... and will not criticize his RFC." *Id.*

After Dr. Slodki's testimony, the ALJ continued the hearing until an MRI and the records from her treatment at Mount Sinai and St. Bernard's could be obtained. *Id.* at 123.

### 4. Testimony of Dr. Mark Oberlander

After Ms. Webb testified at the second hearing, Dr. Oberlander, a clinical psychologist, testified as a medical expert. *Id.* at 52-53. Based on the medical record provided to him, Dr. Oberlander testified to Ms. Webb's mental impairments. *Id.* at 54.

Dr. Oberlander noted that there was no underlying data for Dr. Warikoo's assessment. *Id.* at 53. There was also no evidence that Dr. Warikoo treated Ms. Webb beyond two contacts in

19

September and October of 2008. *Id.* Additionally, Dr. Oberlander found that Ms. Webb's contacts with treating sources were "sporadic." *Id.* Despite Ms. Webb's reports to Dr. Sethi that she had been seeing a psychiatrist for five years, there were no treatment notes or evidence to corroborate those claims. *Id.* at 55.

First, Dr. Oberlander opined that there is evidence that Ms. Webb has an affective disorder. The affective disorder has been diagnosed by several different doctors as major depressive disorder. *Id.* at 54. Ms. Webb reported that her depression manifests itself in a tendency to isolate, and a reduction in the ability to concentrate. In addition, Ms. Webb has a blunted affect, and a dysphoric mood. *Id.* at 55. Dr. Oberlander believed that there is an affective disorder under Social Security listing 12.04. *Id.* However, Dr. Oberlander believed that the affective disorder was secondary to the other non-mental impairments. *Id.*

Second, Dr. Oberlander agreed with Dr. Tomassetti's conclusion that Ms. Webb had mild limitations in her capacity to engage in activities of daily living. *Id.* Dr. Oberlander testified that Ms. Webb's ability to concentrate is moderately impaired and that Ms. Webb retains the cognitive psychological capacity to engage in simple routine work activities. *Id.* at 56. Additionally, there is no evidence of decompensation or deterioration. *Id.*

20

Last, Dr. Oberlander was questioned about Ms. Webb's ability to regularly attend work. Dr. Oberlander stated that Ms. Webb would not be absent from work on the psychiatric grounds alone. *Id.* Ms. Webb's attorney asked Dr. Oberlander whether he agreed with the assessment conducted by DDS, which stated: "Ms. Webb would have a moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances." *Id.* at 56-57. Dr. Oberlander testified that he did not disagree with the DDS assessment, but noted that the term moderate limitation had a legal definition that might not preclude her from working. *Id.* at 57.

### 5. Testimony of Dr. Bernard Stevens

Dr. Bernard Stevens, an internist, testified on the second day of the hearing. Dr. Stevens found that Ms. Webb has morbid obesity, some degenerative disc disease, HIV, and some mild deafness. *Id.* at 58. Dr. Stevens saw no evidence of why Ms. Webb needed an assistive device. *Id.* at 59. Additionally, Dr. Stevens testified that the MRI did not support the need for an assistive device. *Id.* According to Dr. Stevens, Ms. Webb's back pain was purely mechanical and there was no impingement on the spinal canal or any of the neural foramine in the spine. *Id.* Ms. Webb's attorney questioned Dr. Stevens about other examinations which stated that Ms. Webb uses a cane and clutches onto walls to walk ten feet. *Id.* at 61. Dr. Stevens stated that

there was nothing to support her need for a cane or the level of pain she was claiming. *Id.*

When questioned about whether Ms. Webb's other mild HIV-related constitutional symptoms would impact her RFC, Dr. Stevens testified that they would not have any additional impact. *Id.* at 62. In the hearing, the ALJ noted that, through his review of the record, he believed that Ms. Webb was still at a point where she does not need any treatment for her HIV. *Id.* at 65.

When asked what Ms. Webb's exertion level would be limited to, Dr. Stevens testified that Ms. Webb could do light work. *Id.* at 60. In reaching this conclusion, Dr. Stevens considered Ms. Webb's lower back pain, morbid obesity, and mild deafness. *Id.* In addition, Ms. Webb's hearing loss precludes her from working in noisy industrial environments, and limits her to working in an office type setting. *Id.* According to Dr. Stevens, if Ms. Webb did not have the obesity, she could do medium work at full range. *Id.* at 60-61.

### 6. Testimony of the Vocational Expert

On the second day of the hearing, Vocational Expert Sherrill Hoiseth testified ("VE"). *Id.* at 68. Ms. Hoiseth testified that her descriptions were consistent with the Dictionary of Occupational Titles ("DOT"). *Id.* at 72. The relevant area for jobs and employment was the "fourteen county area around Chicago, including Cook and the collar [counties]." *Id.* at 70.

The ALJ asked the VE four hypothetical questions. The first hypothetical was about a person aged 30 to 34, with a 7th grade education, who can read some parts of a newspaper, but needs some assistance with filling out job applications. *Id.* at 68-69. Additionally, the hypothetical person has some mild limitations in activities of daily living, but can engage in simple routine tasks; is able to stand and walk frequently; and is able to engage in postural positioning frequently. *Id.* at 69. The hypothetical person is alert and able to deal with the usual workplace, but with minimal contact with co-workers and supervisors and no contact with the public. *Id.* Additionally, the hypothetical person can lift and carry ten pounds frequently and twenty pounds occasionally. *Id.* The concentration is moderately limited at 90% percent ability to maintain concentration, persistence, and pace. *Id.* Ms. Hoiseth testified that this hypothetical person could perform the job of a housekeeping cleaner, hand packager, or electronic worker. *Id.* at 70. Ms. Hoiseth testified that the general standard for these jobs is a 90% concentration level, and one absence per month would still be acceptable. *Id.* at 73.

The second hypothetical used the same facts, but the hypothetical person's ability to stand and walk was decreased to occasional. *Id.* at 70. Ms. Hoiseth testified that this would change the RFC to sedentary. *Id.* The jobs available in the national economy for a person with these limitations would be a

23

hand packager or production worker. *Id.* at 71. In the regional economy, there are approximately 1300 jobs for hand packagers and 700 jobs for a production worker. *Id.*

The third hypothetical the ALJ posed was of a person with the same limitations in the second hypothetical question, but with depression that distracts the person. *Id.* The hypothetical person's concentration and persistence in pace is around 70 percent. *Id.* The ALJ noted that he would consider a 70 percent limit in pace and concentration to be a marked limitation. *Id.* Ms. Hoiseth testified that there would be no jobs available for this level of impairment. *Id.*

The fourth, and final, hypothetical the ALJ posed was a person with the same impairments as the second hypothetical, but the person has to miss three days of work per month. *Id.* Ms. Hoiseth testified that those limitations would preclude the hypothetical person from working, especially for unskilled labor. *Id.* at 72.

## III. DISCUSSION

### A. Social Security Regulations

For a person to be entitled to disability benefits under the Social Security Act, the person must be disabled. 20 CFR §§ 404.1501. The definition of disabled is the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* The

24

steps that the ALJ must go through to make a determination about whether a person is disabled are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's medical impairments are severe; (3) whether the medical impairments meet or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant could still engage in past relevant work; and (5) whether the claimant can perform any other work after assessing the claimant's residual functional capacity, age, education, and past work experience. *Id.*

At step four, the ALJ must first determine the claimant's RFC. 20 CFR §§ 416.920(e). The RFC is the claimants ability to do physical and mental work despite the claimant's limitations. 20 C.F.R. §§ 416.945. The ALJ must base the decision on all of the relevant evidence in the record. 20 C.F.R. §§ 416.945(a)(1). The RFC considers all of the claimant's medically determinable impairments whether the impairments are considered severe. 20 C.F.R. §§ 416.945(a)(2). If the claimant reaches step five, then the commissioner has the burden of proving that "other jobs exist in the economy that the claimant can perform." *White v. Astrue,* 820 F. Supp. 2d 839, 848 (N.D. Ill. 2011) (citing *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

**B. The ALJ's Decision**

The ALJ's opinion is dated January 25, 2010. R. at 15-29. The ALJ conducted the five step analysis required by the social

security regulations. The ALJ found that Ms. Webb was a younger individual, has a limited education, is able to communicate in English, and has no past relevant work history. *Id.* at 27.

First, the ALJ found that there was no substantial gainful activity. *Id*. at 17. Despite Ms. Webb's tax returns and detailed earnings query ("DEQY") that noted that Ms. Webb did have some income, the ALJ did not use those documents as a basis for his decision because Ms. Webb denied having any income. *Id.*

Second, the ALJ found that Ms. Webb has severe impairments of HIV, depression or dysthymia, hypertension, asthma, and degenerative disc disease. *Id.* The ALJ noted that Ms. Webb has some hearing loss, but found that it was not severe because the audiology report stated that she "has 100% word recognition bilaterally at 70db." *Id.*

Third, the ALJ found that Ms. Webb does not have an impairment that meets or medically equals one of the listed impairments in the regulations. *Id.* According to the ALJ's findings, Ms. Webb's asthma does not meet the listings, because she has never been hospitalized for it and her pulmonary function test only showed that she has borderline obstruction. *Id.* at 18. Ms. Webb's HIV is not severe because it has been asymptomatic since her diagnosis. *Id.* Ms. Webb's hypertension did not meet the listings, because there was no evidence of end organ damage and she does not have heart failure. *Id.*

Regarding Ms. Webb's degenerative disc disease, the ALJ found that the listing for disorders of the spine was not satisfied. *Id.* When Ms. Webb was examined by the consultative examiner, Ms. Webb had a full range of motion in her back and she had normal sensation to a pinprick and a light touch. *Id.* at 18-19. The ALJ also noted Dr. Villanueva's findings that Ms. Webb was capable of walking up to ten feet without a cane at the time of the examination. *Id.* at 19.

The ALJ conducted a part B analysis of Ms. Webb's alleged mental impairments. *Id.* at 19. According to the ALJ's findings, Ms. Webb's mental impairments do not meet the listing's criteria. *Id.* Regarding Ms. Webb's activities of daily living, the ALJ found that Ms. Webb had mild restrictions. The ALJ noted that on Ms. Webb's activities of daily living questionnaire, she indicated that she sometimes plays cards or games with her children and sometimes does the laundry. *Id.* In addition, Ms. Webb reported that she sometimes pays her bills, sometimes goes to her children's school, and often watches TV. *Id.* The ALJ found that Ms. Webb has moderate difficulties with social functioning and has had no episodes of decompensation "of extended duration." *Id.*

Regarding Ms. Webb's persistence in concentration and pace, the ALJ found that Ms. Webb had moderate difficulty. *Id.* In finding this, the ALJ cited Dr. Rosenthal's notes, which

repeatedly found that Ms. Webb's "thoughts were coherent without
evidence of a formal thought disorder." *Id.*

Fourth, the ALJ made his RFC findings. The ALJ found that
Ms. Webb was able "to perform a range of sedentary work." *Id.* at
20. The ALJ found that Ms. Webb can "stand/walk occasionally;
sit frequently; lift/carry 20 pounds occasionally and 10 pounds
frequently; and engage in postural positions frequently."
Additionally, Ms. Webb is able to "perform simple, routine tasks;
work with minimal contact with coworkers and supervisors and no
public contact; maintain concentration, persistence, and pace
with a moderate limitation which is pegged at 90%; demonstrate a
mild limitation in activities of daily living; and demonstrate no
decompensations." *Id.*

In explaining his RFC, the ALJ noted that Dr. Stevens'
testimony would have only limited Ms. Webb to light work, but the
ALJ gave more credit to Ms. Webb's obesity and put her at the
sedentary level. *Id.* at 20. The ALJ also considered the
testimony of Dr. Slodski that Ms. Webb occasionally needs a cane
and noted that the MRI performed on Ms. Webb on July 16, 2009,
showed mild degenerative changes at L4-L5. *Id.* at 21.

The ALJ noted that Dr. Kenney and Dr. Donelan found that Ms.
Webb could work at the light exertion level with avoidance of
concentrated exposure to fumes, odors, dusts, gases, and poor
ventilation. *Id.* at 22. However, The ALJ did not place any

limitation on Ms. Webb's breathing because her pulmonary tests do not indicate any significant impairment. *Id.*

Regarding Ms. Webb's HIV, the ALJ pointed to medical records that it has repeatedly been classified as asymptomatic. *Id.* at 21. Additionally, Ms. Webb was not on any medication for this disease. *Id.* Therefore, he found that HIV did not place a limitation on Ms. Webb. *Id.*

Regarding her hypertension, the ALJ noted that there was no end organ damage. *Id.* at 22. However, the ALJ did point out that, when Ms. Webb was hospitalized in 2005, her blood pressure was high and that the progress notes from Mt. Sinai on June 18, 2008 indicate that her blood pressure was 156/106. *Id.* at 21.

Next, the ALJ discussed Ms. Webb's back pain and how it limits Ms. Webb to sedentary work. *Id.* at 22. The ALJ relied upon the notes from Schwab Rehabilitation Hospital, which stated that Ms. Webb complained of severe back pain. *Id.* The ALJ added that Ms. Webb's "decreasing participation may be a contributing factor for the lack of progress from therapy." *Id.*

In reaching his conclusion regarding Ms. Webb's ability to perform simple routine tasks and to maintain concentration, persistence, and pace at the 90% level, the ALJ used Mr. Carlsen's progress notes, which stated that Ms. Webb was oriented to time, place, person, and situation. *Id.* at 23. The ALJ noted that Ms. Webb has been dealing with various situational stressors such as having her son incarcerated and her brothers dying. *Id.*

Ms. Webb's claims of being depressed and having low energy was consistent with Mr. Carlsen and Dr. Rosenthal's notes. *Id.*

The ALJ also discussed Dr. Rosenthal's notes, which indicated that Ms. Webb's thoughts were coherent, her mood was sad, and she was irritable. *Id.* at 24. Dr. Rosenthal's notes also stated that she was oriented to person, place, and time. *Id.* at 23.

In assessing Ms. Webb's credibility, the ALJ did not find Ms. Webb's testimony regarding her depression to be completely credible. *Id.* at 26. First, the ALJ noted that Ms. Webb claimed to have been seeing a psychiatrist for 8 years, but there was nothing in the record to support that claim. *Id.* Second, Ms. Webb's statements that she lies in bed all day is not credible, because neither her depression nor her physical impairments would mandate this. *Id.* Third, Dr. Rosenthal's assessment contradicts Ms. Webb's claim of severe depression. *Id.* Last, the ALJ noted that Ms. Webb did not put much effort into her therapy regimen. *Id.*

In considering the medical records and testimony, the ALJ adopted Dr. Stevens' testimony. *Id.* Specifically, he adopted Dr. Stevens' testimony that Ms. Webb has morbid obesity, her HIV is not active, and that she does not need an assistive device. *Id.* The ALJ also noted that Dr. Stevens opined that Ms. Webb's RFC is at light work, in a non-noisy office setting. *Id.*

The ALJ did not "place any significant weight" on the opinions of Dr. Rosenfeld and Dr. Slodki, because they did not have the full record when they testified. *Id.* Dr. Rosenfeld testified without seeing the eight years of progress or treatment notes. *Id.* The ALJ noted that Dr. Slodki's statement about agreeing with Dr. Torres regarding the cane use was made without having the entire record. *Id.*

The ALJ did not agree with Dr. Warikoo's assessment that Ms. Webb's mental impairments prevent her from having any substantial gainful activity. *Id.* In discrediting Dr. Warikoo's assessment, the ALJ noted that Dr. Warikoo's treatment notes are inconsistent with her assessment. *Id.* The treatment notes indicate that Ms. Webb's mood had been improving, her sleep had been improving, and that she was beginning to feel better. *Id.* at 24-25. The notes also reflect that Ms. Webb was able to smile and laugh, her thoughts were coherent, and she had no delusions or abnormal perceptions. *Id.* at 25.

Further, Dr. Warikoo's opinion about Ms. Webb's deficiencies in concentration, persistence, and pace is contradicted by Dr. Rosenthal's findings that Ms. Webb's "attention and concentration were okay." *Id.* at 26.

Regarding, Ms. Webb's alleged difficulties with social functioning, the ALJ found that Ms. Webb's own activities of daily living contradicted Dr. Warikoo's assessment. *Id.* at 27. On that form, Ms. Webb indicated that she sometimes goes to her

children's school, sometimes plays with her children, sometimes
talks to her neighbors, and talks on the phone. *Id.* The ALJ
found these statements to be inconsistent with Dr. Warikoo's RFC.
*Id.* In addition, the ALJ noted that the GAF score of 55 given by
Dr. Warikoo does not support her assessment of Ms. Webb's ability
to perform work related functions. *Id.*

The ALJ did not accept Dr. Torres' assessment and instead
accepted Dr. Stevens' testimony. *Id.* The ALJ discredited Dr.
Torres' assessment because he had only seen Ms. Webb twice. *Id.*
Further, Dr. Torres' notes that state that Ms. Webb's pain
frequently interferes with her ability to concentrate are
inconsistent with Dr. Rosenthal's treatment notes and the
treatment notes of her physician. *Id.* Both sets of treatment
notes state that Ms. Webb's concentration and attention were
okay. *Id.*

Regarding Dr. Torres' opinion that Ms. Webb could only
occasionally lift and carry less than ten pounds and could only
sit for less than two hours per day, the ALJ found that Ms.
Webb's report in the activities of daily living form contradicted
the testimony. *Id.*

Finally, the ALJ found that there were a significant amount
of jobs in the national economy that Ms. Webb could perform. *Id.*
at 28. The ALJ arrived at this determination based on the VE's
testimony. The ALJ acknowledged that Ms. Webb has additional
limitations beyond what limits her to sedentary work such as her

32

age, education, work experience, and her RFC. *Id.* In reaching his conclusion, the ALJ agreed with the opinion that Ms. Webb could perform work as a hand packer or production worker. *Id.*

### C. Ms. Webb's Motion for Summary Judgment

On June 29, 2012, Ms. Webb filed a motion for summary judgment. [26] In Ms. Webb's motion for summary judgment, her first argument is that the ALJ erred by finding that Ms. Webb is capable of sedentary work because he (1) failed to resolve conflicts between the medical opinions in the record; and (2) improperly rejected Ms. Webb's alleged limitations in sitting. Ms. Webb's second argument is that the ALJ erred in his evaluation of her Mental Residual Functional Capacity by: (1) "improperly giving greater weight" to Dr. Oberlander's opinion over the treating psychiatrist's opinion; and (2) improperly analyzing Ms. Webb's limitations in concentration, persistence, and pace.
Ms. Webb's final argument is that the ALJ erred by improperly assessing her credibility.

### D. Commissioner's Response and Motion for Summary Judgment

On August 30, 2012, the Commissioner of Social Security filed a motion for summary judgment in favor of the Social Security Administration in response to Ms. Webb's motion for summary judgment. [33] The Commissioner argues that the ALJ (1) reasonably assessed Ms. Webb's physical impairments; (2) properly evaluated the medical opinions; (3) reasonably assessed her

mental impairments; and (4) reasonably assessed Ms. Webb's credibility.

### E. Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

The Court reviewing the ALJ's decision must affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. *Lawson v. Astrue*, 10 C 6851, 2012 WL 1664248, at *12 (N.D. Ill. May 8, 2012) (citing 42 U.S.C. §§ 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). Substantial evidence is more than a mere scintilla," but is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). When the Court reviews the ALJ's decision for substantial evidence and freedom from legal error, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Lawson,* 2012 WL 1664248, at *12. (citing *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Where there is conflicting evidence that "allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts." *Id.* (citing *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

However, an ALJ is not entitled to unlimited judicial deference. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). The reviewing Court does not require a written evaluation of every piece of testimony and evidence. *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984). However, the ALJ must provide a minimal level of articulation of the evidence if considerable evidence is presented that counter's the agency's decision. *Id.* at 78. The evidence supporting the agency's decisions must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477-478 (1951).

## F. Physical RFC

Ms. Webb does not contest the ALJ's findings at step one, two, or three. Ms. Webb argues that the ALJ erred at steps four and five. Regarding step four, Ms. Webb principally argues that the ALJ erred in developing Ms. Webb's physical RFC by failing to resolve conflicts among the medical opinions about: (1) Ms. Webb's need for a cane; (2) whether Ms. Webb was limited to an office-type environment because of her hearing loss; and (3) whether Ms. Webb's breathing limitations require her to avoid exposure to fumes, odors, gases, and poor ventilation.

Additionally, Ms. Webb argues that the ALJ erred in developing the RFC by improperly rejecting Ms. Webb's alleged limitations in sitting.

### 1. Cane Use Findings

Ms. Webb contends that the ALJ made inconsistent findings on the issue of whether she needs a cane. According to Ms. Webb, the ALJ made an inconsistent finding by adopting Dr. Slodki's opinion that she needed the cane, but also adopting Dr. Stevens' entire testimony which included the opinion that Ms. Webb does not need a cane. *Id.* at 26. Dr. Torres' RFC included the opinion that Ms. Webb needs a cane and Dr. Slodki agreed with Dr. Torres. R. at 120, 411-412. However, Dr. Stevens testified that Ms. Webb does not need a cane or assistive device. *Id.* at 59.

Ms. Webb cites *Parker v. Astrue* in support of her argument that the ALJ made inconsistent findings on the same issue, and therefore, the ALJ's decision should be reversed. 597 F.3d 920, 924 (7th Cir. 2010), *as amended on reh'g in part* (May 12, 2010). In *Parker*, the ALJ stated that in his analysis of the claimant's credibility that the claimant's post-traumatic stress disorder ("PTSD") and other psychological impairments "all surfaced after the last date on which she was insured. " *Id.* However, earlier in the opinion, the ALJ stated that "as of the date last insured," the claimant had depression and PTSD. Since the conclusions were inconsistent and the ALJ failed to explain the contradiction, the Seventh Circuit reversed the ALJ's decision. *Id.* at 925.

This case is unlike *Parker*, because there was no internal inconsistency in the ALJ's opinion. First, the ALJ adopted Dr. Stevens' findings, which included the statement that Ms. Webb doesn't need a cane. R. at 26. Second, the ALJ considered several other pieces of medical evidence that showed that she does not need a cane. For example, the ALJ considered Dr. Kenney and Dr. Donelan's RFC, which both concluded that she does not need a cane. *Id.* at 22. Third, the ALJ stated that he was not putting any significant weight on Dr. Slodki's testimony, because Dr. Slodki did not have the entire record before him. *Id.* at 26. Dr. Slodki's testimony included that he agreed with Dr. Torres about the use of a cane. *Id.* at 59. Finally, the ALJ explicitly rejected Dr. Torres' testimony. Dr. Torres was the only doctor who opined that Ms. Webb required a cane. Thus, the Court concludes that the ALJ was consistent in his determination that Ms. Webb did not need a cane.

Ms. Webb next argues that, even if the Court finds that she does not need to use a cane, the ALJ's decision is unclear on that issue and thus it should be remanded for clarification. When reviewing the ALJ's decision, the Court must read the decision as a whole and with commonsense. *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed. Appx. 674, 678-679 (7th Cir. Wis. 2010) (unpublished opinion) (citing *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

Ms. Webb notes that the ALJ's opinion states that he was "considering the testimony of [Dr. Slodki], who stated ... that he believed claimant occasionally needs a cane, based on the report of [Dr. Torres]." R. at 21. However, when reading the decision as a whole, the ALJ was clear on the issue of whether Ms. Webb needed a cane. Specifically, the ALJ stated that he adopted Dr. Stevens' findings, which included that Ms. Webb does not need an assistive device. *Id.* at 26. Further, the ALJ also explicitly "placed no significant weight on" Dr. Slodki's testimony that he agreed with Dr. Torres that Ms. Webb occasionally needs a cane because Dr. Slodki "did not have the entire record before him." *Id.*

If Ms. Webb did require a cane, Ms. Webb argues that the ALJ erred by failing to ask the vocational expert about whether using a cane would impact Ms. Webb's ability to find employment. Therefore, if the ALJ did believe that Ms. Webb needed a cane, he did not include all limitations reasonably supported by the record in his hypothetical questions to the VE.

In posing a hypothetical to the VE, an ALJ "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron*, 19 F.3d at 337 (citations omitted); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An ALJ's decision will be reversed if the hypothetical question "is fundamentally flawed because it is limited to the facts presented in the question and does not

include all of the limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004)

In *Kasarasky*, the ALJ found that the claimant had frequent "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)." *Kasarasky*, 335 F.3d at 543. Despite this finding, the ALJ in that case failed to include the limitation in his hypothetical questions to the VE. *Id.* at 544. Thus, the Seventh Circuit held that the ALJ erred in posing his hypothetical questions to the VE. *Id.*

However, the Court finds that the ALJ in this case reasonably excluded the use of the cane in his hypotheticals to the VE. For example, the ALJ noted that Dr. Villanueva's report stated that she could walk without a cane. R. at 21. Dr. Slodki based his conclusion about Ms. Webb occasionally needing a cane on Dr. Torres's reports. *Id.* However, the ALJ explicitly rejected Dr. Torres's report, which included the opinion that Ms. Webb did not need a cane. *Id.* at 27. Further, as stated above, the ALJ noted that Dr. Slodki did not have the entire record before him when he testified. *Id.* at 26.

Unlike *Kasarasky,* where there was an explicit finding that the ALJ made and failed to include, the ALJ here found that Ms. Webb did not need a cane and, therefore, did not need to include it. The ALJ adopted Dr. Stevens' testimony, which included that

39

"[Ms. Webb] does not need an assistive devices." *Id.* Thus, the ALJ's questions to the VE were proper because they were reasonably supported by the record. Therefore, the Court finds that the ALJ did not error in his findings regarding Ms. Webb's need of an assistive device or in his hypothetical to the VE.

### 2. Exposure to Irritants

Ms. Webb argues that the ALJ erred in his RFC by not putting restrictions on Ms. Webb's breathing. The ALJ noted that Dr. Kenney found that Ms. Webb should not "work in an environment with even moderate exposure to fumes, odors ... gases, [or] poor ventilation." R. at 22. However, the ALJ did not put restrictions on Ms. Webb's breathing in his RFC because the "pulmonary function test shows only borderline obstruction." *Id.* By doing so, Ms. Webb contends that the ALJ came to an improper independent medical conclusion.

An ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Ms. Webb cites *Suide v. Astrue* for the proposition that, if an ALJ rejects all of the medical opinions of record and then comes to a conclusion, then the ALJ is improperly attempting to fill an evidentiary gap with lay medical opinions. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (unpublished opinion). However, in *Suide*, the ALJ rejected a doctor's report about the claimant's RFC and came to conclusions that were not supported by the record. *Id.* The ALJ

40

also erred by failing to weigh the remaining medical evidence.
*Id.*

In this case, the x-rays from Mount Sinai on December 27,
2005, showed that Ms. Webb's lungs were clear and her diaphragms
were normal. R. at 338. The admission notes indicate that, when
Dr. Donelan examined Ms. Webb, he found that her lungs were
clear. On May 23, 2006, Dr. Sethi found that Ms. Webb's "air
entry was good" and there was no wheezing. R. at 342. Further,
Ms. Webb stated that her albuterol inhaler was helping. *Id.* at
343. Upon intake at Schwab Rehabilitation Center When she was
at Mt. Sinai to have her ear drained, on July 30, 2008, Ms.
Webb's respiratory status was spontaneous, regular, and deep.
*Id.* at 431. Her lungs were clear. *Id.* at 424. However, on
November 27, 2007, Dr. Villanueva found that Ms. Webb had
decreased breath sounds, wheezing, and rhonci. Further, at the
time of Dr. Villanueva's examination, Ms. Webb was on medication
for asthma. *Id.* at 372.

Unlike *Suide*, there was objective medical evidence that Ms.
Webb could be exposed to environmental irritants; specifically,
Dr. Villanueva's pulmonary function test. In discounting Dr.
Kenney and Dr. Donelan's opinions regarding a breathing
limitation, the ALJ cited Dr. Villanueva's conclusion that Ms.
Webb's breathing indicated borderline obstruction. R. at 25,
379. By using objective medical evidence, the ALJ was reasonable
in his conclusion that Ms. Webb does not need to limit her

exposure to irritants. Thus, the ALJ did not come to an independent medical conclusion.

In addition, while there is some evidence that Ms. Webb has difficulty breathing, there is also contrary evidence to support the ALJ's conclusion. Although Dr. Donelan's RFC states that Ms. Webb should avoid concentrated exposure to environmental irritants, he also found that Ms. Webb's lungs were normal and clear when she was examined. *Id.* at 359, 362. The Court notes that Dr. Kenney's examination revealed that Ms. Webb's "lungs had decreased breath sounds with wheezing and rhonchi present." *Id.* at 393. However, because there was substantial evidence that Ms. Webb did not need to limit her exposure to environmental irritants, the ALJ's conclusion was reasonable and will thus not be reversed.

### 3. Sitting Limitations

Ms. Webb argues that the ALJ erred in assessing Ms. Webb's RFC by failing to address Ms. Webb's alleged limitations in sitting. In support of her allegations, Ms. Webb points to her testimony that sitting for long periods of time causes back pain. *Id.* at 51. Additionally, Ms. Webb points to the physical therapy notes from Schwab Rehabilitation Center, which show that Ms. Webb complained that sitting for long periods of time makes her pain worse. *Id.* at 315. Ms. Webb also cites Dr. Torres' report that Ms. Webb could only sit for 20 minutes at a time. *Id.* at 411.

An "ALJ need not provide a complete written evaluation of every piece of testimony and evidence" but must meet "a minimal duty to articulate his reasons and make a bridge between the evidence and the outcome." *Rice*, 384 F.3d at 371. Where there is conflicting evidence that would allow reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner, not the courts." *Lawson*, 2012 WL 1664248, at *12 (citing *Herr*, 912 F.2d at 181.

In this case, there is substantial evidence in the record that supports the ALJ's conclusion that Ms. Webb could sit for an extended period of time. For example, in formulating the RFC, the ALJ cited Dr. Kenney's report. R. at 22. Dr. Kenney and Dr. Donelan's reports both conclude that she could sit for 6 hours in an 8 hour work day. *Id.* at 359, 388. Dr. Sethi's report, which the ALJ also cited, showed that Ms. Webb had full range of motion in all of her joints. R. at 22, 359, 388. In addition, the ALJ discussed and discredited Dr. Torres' report that Ms. Webb could sit no more than twenty minutes. R. at 27. Therefore, the Court finds that the ALJ did not err in his analysis of Ms. Webb's alleged sitting limitations.

### 4. Office Type Setting Restriction

Ms. Webb next argues that the ALJ was unclear on the issue of whether Ms. Webb's hearing loss requires her to work in an office-type setting. According to Ms. Webb, the ALJ was unclear because he adopted Dr. Stevens' opinion, which contained the

opinion that Ms. Webb "should work in an office setting." R. at 26. Despite adopting Dr. Stevens' opinion, the ALJ's RFC does not contain any limitation to an office environment. *Id.* at 20.

Once the ALJ finds that the claimant has a severe impairment, the ALJ must consider the aggregate effect of all of the Claimant's limitations, both severe and non-severe. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. §§ 404.1520(f)). When reviewing an ALJ's opinion, the Court reads it as a whole and with common sense. *Buckhanon ex rel. J.H.*, 368 Fed. Appx. at 678-679.

The ALJ considered Ms. Webb's hearing loss and concluded that it "does not cause more than minimal limitations in her ability to perform work-related activities." R. at 17. Further, the reports by Dr. Donelan and Dr. Kenney indicate that Ms. Webb does not need a noise-level restriction. *Id.* at 362, 391. Dr. Sethi's report also indicated that Ms. Webb "was able to understand conversational voices." *Id.* at 341. The ALJ also cited Ms. Webb's audiology report, which indicated that she had 100% word recognition bilaterally at 70db. *Id*. at 17. The Court concludes that there was sufficient evidence which supports the ALJ's exclusion of a work-place limitation in his RFC.

Ms. Webb also argues that the ALJ's determination that her hearing loss did not limit her to an office-type setting was an independent medical determination, citing *Rohan* and *Wilder*. Mot. at p. 17; Reply at p. 5. In *Rohan*, the ALJ came to an

44

independent medical conclusion by determining that the claimant's small machine repair/resale business was inconsistent with a finding of major depression. *Rohan*, 98 F.3d at 970. The ALJ did not provide any other medical basis for finding that the claimant's depression was not severe. *Id.* at 971. The Seventh Circuit held that the ALJ substituted "his own judgment for that of the medical witnesses." *Id.*

Similarly, in *Wilder,* an ALJ erred by finding that the claimant being allowed to adopt a child and holding a job as a security guard in which she was allowed to carry a gun was inconsistent with severe depression. *Wilder v. Chater*, 64 F.3d 335, 336 (7th Cir. 1995). In that case, the only medical evidence presented about the claimant's depression was the direct testimony of a psychiatrist about the onset of the claimant's depression. *Id.* at 337. There was no other evidence about the severity of the claimant's depression. *Id.*

Unlike *Wilder* or *Rohan,* where there was no other medical evidence presented that supported the ALJ's conclusion, the ALJ in this case did have sufficient medical evidence to support his conclusion. As stated above, Dr. Sethi found that Ms. Webb could understand conversational voices. R. at 341. Further, both Dr. Donelan and Dr. Kenney found that Ms. Webb does not need a noise restriction. *Id.* at 362, 393. Therefore, the ALJ did not come to an independent medical conclusion in finding that Ms. Webb did not need an environmental noise restriction.

Ms. Webb argues that if she does require a restriction to office-type environments, then the ALJ also erred at step five by not including the restrictions in his hypothetical to the VE and by relying on jobs that are performed in a factory-type. However, because the Court concludes that the ALJ reasonably excluded a limitation to an office-type setting in formulating his RFC, the ALJ did not err in formulating his questions to the VE.

**G. Ms. Webb's Mental RFC**

Ms. Webb argues that the ALJ erred in evaluating her mental RFC. Specifically, Ms. Webb argues that the ALJ erred by (1) improperly giving greater weight to Dr. Oberlander, a medical expert, over that of her treating physician Dr. Warikoo; and (2) by improperly analyzing Ms. Webb's alleged limitations in concentration, persistence, or pace.

**1. Dr. Warikoo's Assessment**

In the medical reliability determination bridge section of his opinion, the ALJ rejected Dr. Warikoo's assessment because it was inconsistent with her treatment notes. R. at 26. Ms. Webb argues that the ALJ erred in his analysis of the record and Dr. Warikoo's notes.

Generally, a treating physician's opinion is entitled to controlling weight because of the physician's "greater familiarity with the claimant's condition and circumstances" if it "is not inconsistent with other substantial evidence in the

46

record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (internal citations omitted); 20 C.F.R. §§ 404.1527(c)(2)). Some of the factors to consider in determining whether to give controlling weight to a treating physician's opinion are: (1) "the nature and extent of the treating relationship"; (2) the amount of medical evidence the physician uses and provides to support the opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the physician is a specialist in the area in which he is providing his opinion; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 416.927 (c)(2)(i-vi).

Ms. Webb argues that the ALJ erred in his analysis by finding that Dr. Warikoo's treatment notes were inconsistent with her finding that Ms. Webb had extreme difficulties in maintaining social functioning. Ms. Webb cites to Dr. Warikoo's notes that indicate that Ms. Webb complained of social withdrawal and the inability to enjoy activities. R. at 550, 553. Further, Ms. Webb also testified to not being a member of any clubs, not wanting to be around people, and not wanting to participate in any activities. *Id.* at 108. While these are indicative of difficulty in maintaining social functioning, there are numerous other pieces of evidence in the record which undercut her claim of extreme difficulties in maintaining social functioning. The ALJ cited some of the pieces of evidence he used in coming to his conclusion. *Id.* at 26-27. For example, Dr. Warikoo's notes show

that Ms. Webb was able to smile and laugh and she did not have evidence of a formal thought disorder. *Id.* at 27. The ALJ also cited Dr. Rosenthal's notes, which show that Ms. Webb "was cooperative with fair eye contact" and did not have any psychomotor abnormalities. *Id.* In addition, the ALJ found Ms. Webb's activities of daily living report to be inconsistent with Dr. Warikoo's conclusions, because Ms. Webb stated that she sometimes plays cards with her children, sometimes goes to school with her children, talks to her neighbors, and talks on the phone. *Id.*

The ALJ found that Dr. Warikoo's GAF scores contradicted her own conclusions. *Id.* Ms. Webb argues that the GAF score is a score that is assessed for a specific period of time and the longitudinal record is consistent with Dr. Warikoo's assessment. Throughout the record, Ms. Webb's GAF has ranged from 45 to 60. *Id.* at 369, 493, 495, 497, 507, 535. Dr. Warikoo's opinion that Ms. Webb has extreme difficulty with social functioning was made at the same time that her GAF was a 55. *Id.* at 529-532. This fact undercuts Dr. Warikoo's opinion that she has extreme difficulty with social functioning because her GAF was at the "moderate symptom" level of functioning. The ALJ noted that Ms. Webb's GAF score of a 45 also relates to her life with children. *Id.* at 25. The ALJ concluded that, on the whole, the evidence is more consistent with Dr. Rosenthal's conclusions. *Id.* In light of the record as a whole, the ALJ articulated a reasonable basis

and there was substantial evidence for discounting Dr. Warikoo's opinion.

Ms. Webb next argues that the ALJ did not provide an explanation for why he was accepting Dr. Oberlander's opinion over Dr. Warikoo's opinion. However, the ALJ's opinion outlines pieces of evidence in the record that are consistent with Dr. Oberlander's opinion. *Id.* at 23-24. For example the ALJ cited Dr. Rosenthal's notes. *Id.* at 23. Dr. Rosenthal's notes show that, although Ms. Webb did present with depressed mood, low motivation, low energy, occasional crying spells, and anhedonia, she was compliant with her medication, denied suicidal ideation, and reported that her sleep and appetite was fine. *Id.* Thus, the ALJ did provide evidence for why he was accepting Dr. Oberlander's opinion.

### 2. Concentration, Persistence, or Pace

Next, Ms. Webb argues that the ALJ did not have a reasonable basis to find that Ms. Webb's moderate impairment with persistence, concentration, or pace equates to an ability to concentrate for 90% of the workday. Ms. Webb does not argue that a specific number would be appropriate.

In *Reed v. Astrue*, the Court upheld an ALJ's determination that a moderate impairment in concentration, persistence, or pace could be considered a 90% ability to maintain concentration during a workday. *Reed v. Astrue*, 10 C 0001, 2011 WL 3895302, at *11 (N.D. Ill. Aug. 31, 2011). Ms. Webb notes that in *Reed*, the

claimant's GAF score was a 60, which is in the top range of the "moderate symptom category." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. Am. Psychiatric Ass'n 1994). Ms. Webb attempts to distinguish this case by pointing out that the highest GAF score she received was a 55 and her GAF score was frequently a 50. First, the Court notes that Ms. Webb's highest GAF score was 60. R. at 535. Dr. Rosenthal was the doctor who assessed Ms. Webb as having a GAF score of 60. *Id.* Second, in his medical reliability determination bridge section, the ALJ credited Dr. Rosenthal's opinion and GAF score instead of Dr. Warikoo's opinion. R. at 27. Finally, the ALJ noted that Dr. Rosenthal found that Ms. Webb's concentration and attention was "okay." *Id.* Therefore, the ALJ reasonably found that Ms. Webb could maintain concentration, persistence, or pace at a 90% level.

Further, Ms. Webb argues that the ALJ's questions in his hypothetical to the VE that limited Ms. Webb to simple, routine, tasks did not account for Ms. Webb's limitations in concentration, persistence, or pace. An ALJ's hypothetical to the VE must "account for all limitations", including deficiencies of concentration, persistence, or pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) *citing Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir.2009); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir.2003); *Steele,* 290 F.3d at 942.

In *O'Conner-Spinner*, the ALJ erred by finding in the RFC

that the claimant had a moderate limitation in maintaining concentration, persistence, or pace but failing to include the limitation in the hypothetical to the VE. *O'Connor-Spinner*, 627 F.3d at 618. Instead of including the limitation, the ALJ simply limited the hypothetical worker to "routine, repetitive tasks with simple instructions." *Id.*

Here, the ALJ specifically addressed Ms. Webb's limitation in concentration, persistence, and pace. In the first hypothetical to the VE, the ALJ stated "let's say that the person is able to maintain concentration persistence on days with a mild limitation" and "I'm going to peg the residual at 90 percent ability to maintain concentration, persistence, and pace." R at 69. This condition was included in the first, second, and fourth hypothetical. R. at 69-72. Thus, the Court concludes that the ALJ properly included Ms. Webb's limitations in concentration, persistence, and pace in his hypotheticals to the VE.

### H. Credibility Findings

#### 1. Ms. Webb's Credibility

The next issue is whether the ALJ properly assessed Ms. Webb's credibility and whether the ALJ summarized the evidence without analyzing the evidence. In assessing a claimant's credibility, the ALJ's findings are "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek*, 226 F.3d at 811; *Timms v. Astrue*, 09 C 1416, 2010 WL 4930386 (N.D. Ill. Nov. 23,

2010). Thus, an ALJ's credibility determination will not be reversed "unless it is patently wrong." *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir.1995). A claimant may use his own testimony to establish the severity of the symptoms, but the subjective complaints do not need to be accepted "insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). The ALJ must consider the entire case record, this includes: the objective medical evidence; the claimant's own statements about her symptoms; the statements and opinions of the treating physicians, examining physicians, and other third parties; and other relevant evidence in the case record." *Arnold*, 473 F.3d at 823. Further, if an ALJ relies on inconsistencies in finding the witness not credible, he must specifically detail the inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887.

The ALJ found Ms. Webb's statements about the "intensity, persistence, and limiting effects" of her symptoms to be "not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. at 26. In making his credibility determination, the ALJ discussed three issues: (1) Ms. Webb's testimony about seeing a psychiatrist for eight years; (2) her testimony about the intensity, severity, and symptoms of her depression; and (3) her apparent lack of effort with her physical therapy regimen. R. at 26.

First, Ms. Webb criticizes the ALJ's use of the boilerplate language:

> After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. at 26. The Seventh Circuit criticized the use of this language as getting it backward by implying that "ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F. 3d 640, 645 (7th Cir. 2012). Further, the language "fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony." *Clifton v. Astrue*, 11 C 1141, 2012 WL 2277860, at *18 (N.D. Ill. June 18, 2012) (citing *Spiva v. Astrue*, 628 F.3d 346 (7th Cir.2010); *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010)). In *Bjornson*, the ALJ found the claimant's testimony to be not credible on the basis of her doctor's treatment notes which indicated that she was complaining of headaches less. *Id.* However, the Seventh Circuit held that the ALJ erred by ignoring portions of the doctor's notes that would have resolved the inconsistency. *Id.* Specifically, the doctor's notes stated that her "headaches 'were always present'" and that "her headaches have been an ongoing problem." *Id.*

Unlike *Bjornson*, where the ALJ relied on the boilerplate language and gave very little information and evidence for why he

found the claimant's statements not credible, the ALJ here provided three different reasons for finding Ms. Webb's statements to be not credible.

Next, Ms. Webb argues that the ALJ erred in assessing her credibility. In the ALJ's credibility assessment, he noted the inconsistency between the medical record and Ms. Webb's statements that she had been seeing a psychiatrist for 8 years. R. at 26. Ms. Webb argues that the ALJ made an improper negative inference based on an absence of records. However, the ALJ did consider Dr. Rosenthal's notes which stated that Ms. Webb had a suicide attempt in 1991, was discharged, and never followed up. Record at 23, 533.

Further, in assessing Ms. Webb's credibility, the ALJ noted numerous inconsistencies between her testimony about the severity of her psychological symptoms and the medical records. For example, the ALJ noted that Dr. Warikoo found that Ms. Webb's affect was stable and she was able to laugh and smile. *Id.* at 25. In addition, Dr. Rosenthal noted that Ms. Webb reported that the medication seemed to be working, and her sleep and mood was improving. *Id.* at 533-549.

Ms. Webb also argues that the ALJ erred in finding that Ms. Webb "made very little effort" in cooperating with her physical therapy regime, because the notes from 2008 indicate that she attended seven sessions and was making some progress with her physical therapy. R. at 487. However, the notes from 2008 also

show that she cancelled two appointments, missed the third appointment and then never called back to reschedule. R. at 485. The fact that Ms. Webb never called back to schedule another appointment is some evidence that Ms. Webb was not compliant with her physical therapy regimen. The Court finds that there was substantial evidence which supported the ALJ's finding.

Ms. Webb argues that the ALJ impermissibly substituted his lay view of depression by finding that "neither her depression nor her physical impairments, including her obesity, would compel that she lie in bed all day." R. at 26. However, the ALJ had a reasonable basis for finding that neither Ms. Webb's physical impairments nor depression would compel that she lie in bed all day. For example, Dr. Rosenthal's notes indicate that, on January 27, 2009, Ms. Webb stated that "her appetite and sleep were fine and that her attention and concentration were okay." *Id.* at 26,533. On June 22, 2009, Ms. Webb also stated to Dr. Rosenthal that "she is noticing that she is beginning to feel better" and that she went out with her kids over the weekend for about the first time. *Id* at 24, 548. Ms. Webb did present with low motivation and a dysphoric mood, but her affect was constricted and appropriate to the situation. *Id.* at 534. Regarding Ms. Webb's physical impairments, Dr. Sethi found that Ms. Webb had a full range of motion. *Id.* at 18-19. The ALJ also noted that Dr. Sethi's report found that there was "very little wrong with [Ms. Webb's] musculoskeletal, neurologic system, or

55

other system. *Id.* at 22. In addition, the ALJ cited that Ms. Webb's activities of daily living undercut her claims of pain and impairment. *Id.* at 19. The ALJ cited all of this medical evidence throughout his opinion, and therefore reasonably concluded that Ms. Webb's depression and physical impairments do not require her to lay in bed all day. Thus, the ALJ did not come to an independent medical conclusion based on his lay opinion of depression and obesity. The Court finds that the ALJ's conclusions about Ms. Webb's credibility were not patently wrong and therefore the ALJ's findings will not be disturbed.

## 2. Medical Credibility Findings

Ms. Webb argues that the ALJ improperly discredited Dr. Torres' opinion and failed to explain why he adopted Dr. Stevens' opinion. Generally, "A treating physician's opinion is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2); see *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

However, the treating physician's opinion "is not the final word on a claimant's disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. Wis. 2007). If an ALJ is discounting the treating physician's opinion, then the ALJ "must give good reasons." 20 C.F.R. §§ 404.1527(c)(2); *Campbell v. Astrue*, 627F.3d 299, 306 (7th Cir. 2010); *Mueller*, 2012 WL 3575274, at 3.

An ALJ does not err by rejecting a treating physician's opinion when it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

In determining what weight to give to a physician's opinion, the ALJ must consider: the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. Wis. 2010) (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). An ALJ does not need to "accept a doctor's opinion if it 'is brief, conclusory, and inadequately supported by clinical findings." *Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) (unpublished opinion) (quoting *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir.2002)); *see also Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000).

In *Mueller*, the ALJ discredited the treating physician's opinion. However, the ALJ failed to provide reasons for discrediting beyond "[alluding] to opinions of other mental health professionals." *Mueller v. Astrue*, 11-3013, 2012 WL 3575274, at *5 (7th Cir. Aug. 21, 2012). In addition, the ALJ's

opinion did not give the names of any of the other physicians that conflicted with the treating physician. *Id.* Thus, the Seventh Circuit held that the ALJ erred by not giving controlling weight to the claimant's treating physician. *Id.*

On the other hand, in *Schmidt* the Seventh Circuit held that the ALJ adequately explained why he was discounting the treating physician's opinion. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. Wis. 2007). The ALJ discredited the treating physician's opinion that the claimant was not capable of performing work at the sedentary level. *Id.* In discrediting the physician's opinion, the ALJ noted that the physician's opinions were contradicted by her own treatment notes which stated that her examination was benign. *Id.* Further, the ALJ discredited the claimant's allegations about her pain, in part because the claimant "did not follow through with her physical therapy or pursue pain management." *Id.* at 843.

In the case before the Court, the ALJ provided ample reasoning for rejecting Dr. Torres' opinion. First, the ALJ noted that Dr. Torres had only seen Ms. Webb on two occasions prior to writing his RFC. R. at 27. The frequency of the examination is a proper basis for discounting his opinion. Second, the ALJ found that Dr. Torres' opinion about Ms. Webb's concentration was contradicted by Dr. Rosenthal's notes. *Id.* Specifically, the ALJ pointed to notes which indicated that Ms. Webb's concentration was "okay" and that Ms. Webb's mood and

sleep was improving. *Id*. Dr. Rosenthal was a treating psychiatrist. Further, the ALJ found that Dr. Torres' opinion was contradicted by Ms. Webb's own activities of daily living form which stated that she sometimes plays cards with her children and that she sometimes attends school with her children. *Id*. All of these reasons are valid reasons to discount Dr. Torres' opinion. Thus, the Court concludes that the ALJ properly discounted Dr. Torres' opinion.

Next, Ms. Webb argues that the ALJ did not properly articulate why he was accepting Dr. Stevens' opinion. An "ALJ need not provide a complete written evaluation of every piece of testimony and evidence" but must meet "a minimal duty to articulate his reasons and make a bridge between the evidence and the outcome." *Rice*, 384 F.3d at 371.

When reading the opinion as a whole, the ALJ adopted Dr. Stevens' opinion because he found it more consistent with the record. The ALJ discredited opinions that were contrary to Dr. Stevens, and provided reasons for discrediting the opinions. R. at 26-27. With the exception of the breathing limitation, Dr. Stevens' opinion is consistent with Dr. Donelan and Dr. Kenney's assessment. R. at 22. The ALJ also rejected Dr. Torres' opinion, which was inconsistent with Dr. Stevens' opinion, and explained why they were inconsistent with the record as a whole. *Id.* at 27. Dr. Sethi's opinion is also consistent with Dr. Stevens' opinion. *Id.* at 22.

The ALJ sufficiently articulated the consistencies between Dr. Stevens' opinion and the record as a whole, and where the ALJ disagreed with Dr. Stevens, he provided adequate evidentiary support for his conclusion. *Id.* at 26. For example, Dr. Stevens opined that Ms. Webb could perform work at the light exertion level, but the ALJ found that Ms. Webb's obesity would limit her to sedentary work. R. at 21. Reading the opinion as a whole and with commonsense, the Court comes to the conclusion that the ALJ found Dr. Stevens' opinion to be more consistent with the medical evidence and testimony. Thus, the ALJ did not err by adopting Dr. Stevens' testimony.

**IV. CONCLUSION**

Having carefully reviewed the entire record, and for the reasons set forth above, the Court finds that the Commissioner's conclusion that Plaintiff was not disabled is supported by substantial evidence in the record as a whole. Accordingly, Plaintiff's Motion for Summary Judgment is denied and the Commissioner's Motion for Summary Judgment is granted.


Date: January 10, 2013          E N T E R E D:

_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

60